*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
September 5, 2024

v

ERNEST DEMOTT MCINTOSH,

        Defendant-Appellant.

No. 362255
Kent Circuit Court
LC No. 19-007976-FC

Before: FEENEY, P.J., and RICK and N. P. HOOD, JJ.

PER CURIAM.

Defendant Ernest Demott McIntosh appeals as of right his jury trial conviction of one count of first-degree criminal sexual conduct (CSC-I) under MCL 750.520b(1)(b)(*ii*) (penetration of a victim who is between 13 and 15 years old and is related by blood). The trial court sentenced McIntosh to serve 13 to 30 years' imprisonment as a third-offense habitual offender, MCL 769.11. On appeal, McIntosh raises ineffective-assistance-of-counsel claims related to purported evidentiary errors and challenges to his guidelines scoring. Concluding that there was no reversible error, we affirm.

## I. BACKGROUND

This case arises out of McIntosh's sexual assault of his biological daughter in Grand Rapids, Michigan, in August 2019. The victim testified that McIntosh is her father. He became involved in her life when she was four years old, but she did not see him regularly or have a sustained relationship with him until she was approximately 11 or 12 years old.

The sexual assault that formed the basis of McIntosh's conviction occurred on August 16, 2019, when the victim was 15 years old. At trial, the victim testified that McIntosh took her to his son's apartment. There, McIntosh told her that he bought a new outfit for her, but said that she could not have it until she did something for him. While she was changing into the outfit in a bedroom, McIntosh exited a nearby bathroom naked. According to the victim, he entered the bedroom and tried to take her clothes off while bending her over the bed. She testified that McIntosh said, "If you make me happy, I'll give you what you want." The victim recalled that McIntosh said this to her often, and it meant that he wanted to sexually assault her.

-1-

According to the victim, McIntosh pulled down her shorts and told her to bend over the bed in the bedroom. McIntosh then tried to put his penis "inside" of her. She testified that McIntosh's penis did not go all the way into her vagina, but it went part way in, and the victim felt a sharp pain. During cross-examination, the defense attempted to impeach her with prior statements she made about the assault that could be viewed as having a more equivocal description of whether McIntosh penetrated her. Her trial testimony, however, unequivocally described a penetrative sex act.

The victim testified that she was menstruating, and after the assault, she bled more, and she got blood on her new shorts because she bled through the sanitary napkin that she was wearing. The victim then felt McIntosh "dry humping" her on her buttocks, while asking the victim to just let him "nut," meaning ejaculate. While testifying she recalled, "I remember he used to always ask if he can get a nut or I can make him nut." The victim was able to push McIntosh off of her, and she pulled her pants up and ran to a friend's house. At her friends house, she called her mother, who picked her up and drove her to a hospital emergency room. After the hospital, her mother drove her to get a sexual assault examination, where they took swab samples from the victim's vagina. After that, they went to the police. The hospital visit, sexual assault examination, and police interview all occurred the afternoon and evening of the assault.

The victim's mother also corroborated several aspects of her testimony. The mother met McIntosh because his mother was a neighbor of one of her friends in Grand Rapids. She became pregnant with the victim when she was 15 years old and McIntosh was in his 30s. She testified that McIntosh did not spend much time with the victim until she was 11 or 12 years old. When the victim did begin spending time with him, her behavior changed. The victim's mother recalled a 2017 incident where the victim jumped out of McIntosh's car and refused to get back in. Shortly after the incident, the victim suffered an apparent suicide attempt and began treatment at a psychiatric hospital. In 2018, the victim told her that she did not want to visit McIntosh. She also refused to sit in the front seat next to McIntosh when he would pick her up for visits.

The mother testified that the morning of the sexual assault underpinning this case, McIntosh picked up the victim to run some errands. Later that day, McIntosh called the mother and sounded "frantic," but only asked whether the mother wanted the victim's hair braided. Approximately 30 minutes later, around 3:00 p.m., a neighbor who lived near McIntosh's mother called the mother and said that something happened to the victim and that she had the victim at her house. The mother spoke with the victim who sounded scared and was crying. She rushed to the neighbor's house and saw that the victim was crying and that her clothes had blood on them. The victim told her mother that McIntosh sexually assaulted her, so her mother took her to the emergency room. After the staff examined the victim at the emergency room, the mother took the victim to the Young Women's Christian Association (YWCA), and the victim underwent a sexual assault examination while the mother sat in the waiting room.

At trial, the prosecution offered the testimony of Dr. Tom Czolgosz, the emergency physician who first treated the victim. He testified that he examined the victim around 5:00 p.m. He consulted with an infectious disease doctor, tested the victim for sexually transmitted infections, and gave the victim antiretroviral medication to counteract potential exposure to HIV. He conducted an external examination for physical trauma. Outside the presence of the jury, Dr. Czolgosz explained that the victim did not consent to a more invasive examination. He further explained that he always sends patients in her position to get a sexual assault nurse examiner

(SANE) examination after treatment in the emergency room, so he did not push for an internal exam, knowing such an examination would occur later.

Before the jury, Dr. Czolgosz testified that he referred the victim for a SANE examination at the YWCA medical facility. He explained that a SANE examination involves a more invasive physical examination. He further testified that the nurses conducting the examinations are specially trained in the type of exam, talking to patients after a trauma "as well as potentially evidence gathering." Although the emergency department was equipped to perform such an examination, he testified that YWCA staff were specialized and are preferred unless there is a scheduling or logistical reason why they cannot perform the exam.

After being discharged, the victim went with her mother to the YWCA for a SANE examination at 8:30 p.m. the day of the assault. Dana Paiz, the physician's assistant that conducted her exam, did not testify and was not subject to cross-examination. Instead, Stephanie Solis, the director of the Nurse Examiner Program at the Grand Rapids YWCA, and Paiz's supervisor, testified. The court admitted a redacted copy of the Paiz's SANE report without objection from the defense. The court also qualified Solis as an expert in sexual assault nurse examinations.

Before and during trial, the attorneys and the trial court fully addressed the issue of the admissibility of the SANE report. The trial court ruled that a portion of the report was admissible under MRE 803(4) because the victim made certain statements for the purpose of medical treatment. The trial court declined to admit other parts of the report, including any reference to McIntosh's conduct before the assault and any reference to a diagnosis of sexual assault. The trial court ruled that, because the SANE did not find physical evidence that the victim was sexually assaulted, any diagnosis would have been based on the victim's statements and this would constitute improper bolstering. See *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). However, the trial court allowed the redacted report to be admitted during Solis's testimony because it was a business record pursuant to MRE 803(6), and the physician assistant who examined the victim was unavailable at the time of trial.

Relying on the physician assistant's SANE report, Solis testified that the victim reported that she was assaulted at about 3:00 p.m. that day. Solis read from the report to the jury. According to the report, the victim reported that McIntosh repeatedly asked her to remove her pants and that he said: " 'Don't worry, it will be quick. Just let me nut.' " The victim further stated that McIntosh pushed her forward onto the bed and held her down by pressing her back. McIntosh was able to pull down the victim's pants, and although the victim said "no," McIntosh put his penis inside her. The victim stated that the penetration was painful, but she was able to push McIntosh away and get out of the room. The victim reported that she thought McIntosh was angry with her because she wrote a note to him about him abusing her for two years. The victim also stated that she asked McIntosh why he did things like lick her vagina, and he replied that she was "special." When asked about how she felt physically, the victim told the nurse that her vagina hurt and felt as though something was "poking" her. When asked how she felt emotionally, the victim replied that she felt "depressed." The nurse noted that the victim was very quiet, she made little eye contact, and she had a sad affect.

Solis also testified about the physical examination. The genital examination showed that the victim had dried, white fluid on the left side of her clitoral hood. A swab of the fluid was taken

and placed in the evidence box for further testing by law enforcement, but Solis testified that she did not regularly receive lab results that would identify substances like that found on the victim. Because the victim was menstruating, the nurse observed blood, but no injury to the victim's vagina, though it was tender to the touch. The victim declined to have a speculum examination, which Solis testified is common with victims her age. On cross-examination, Solis testified that, while nurses do collect information, her job as a nurse "is to provide medical care to a patient."

After the emergency room visit and the SANE exam, the victim and her mother went to the police late in the evening of August 16 or early in the morning of August 17. The police interviewed the victim. During the interview, she described a letter that she gave McIntosh earlier in the day before the sexual assault. In the letter, the victim asked McIntosh to stop sexually assaulting her and to have a normal father-daughter relationship. At trial, the victim read a draft of the letter. Police witnesses testified about a jail call McIntosh made to his wife less than a week after the assault where he said the victim had read him a letter and that he found it and threw it away.

At trial, McIntosh testified on his own behalf. He denied ever sexually assaulting her. He also disputed the victim and mother's versions of events from August 2019. He claimed that the victim fabricated the allegations of sexual assault because of arguments they had over her behavior. He denied that she read a letter to him but admitted that she gave him a letter the day of the assault. According to McIntosh, the letter belittled him and complained that he gave more material things to his other children. He stated that he believed it was disrespectful so he ripped it up and threw it away.

McIntosh's cousin, Lorontay McIntosh, also testified on behalf of the defense. He testified that the victim told him that she lied about her allegation that McIntosh sexually assaulted her. Specifically, he stated, "She told me that was a lie because she couldn't be at her boyfriend[']s, she couldn't have sex, and she couldn't—she couldn't get stuff that she wanted because she was on punishment." Lorontay, who was in Michigan Department of Corrections (MDOC) custody at the time of his testimony, testified while wearing MDOC-issued jumpsuit. Defense counsel addressed his attire and obvious in-custody status at the start of his direct examination:

> *Q*. Now you dressed in jail uniform, correct?
>
> *A*. Yes, sir.
>
> *Q*. You've been a bad boy, haven't you?
>
> *A*. Yes, I have.
>
> *Q*. And you're paying the price for that?
>
> *A*. Yes, I am.

On cross-examination, the prosecutor asked where Lorontay lived, and he replied that he was living at the Macomb Correctional Facility. When asked why he was there, Lorontay answered, "For armed robbery." The prosecutor then proceeded to ask Lorontay about other felonies he

committed, and Lorontay confirmed his prior convictions of receiving and concealing stolen property and breaking into a building with intent to commit a larceny. The defense did not object.

The jury found McIntosh guilty as charged. As stated, the trial court sentenced McIntosh to serve 13 to 30 years' imprisonment as a third-offense habitual offender. The sentence was within the advisory guidelines calculated at the time of sentencing. Relevant here, the trial court scored offense variable (OV) 3 (physical harm) at 5 points based on the vaginal pain the victim suffered from the assault. The trial court also scored OV 19 (interference with administration of justice) at 10 points due to McIntosh's conduct of destroying the victim's letter detailing his pattern of sexual assault. This appeal followed.

## II. INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS

McIntosh claims that he was denied the effective assistance of counsel because (1) defense counsel stipulated to the admission of the SANE report at trial and (2) defense counsel failed to object to impeachment evidence introduced during the testimony of one of his defense witnesses. Both claims lack merit.

## A. LEGAL STANDARDS FOR INEFFECTIVE ASSISTANCE OF COUNSEL

As stated in *People v Otto*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362161); slip op at 4:

> A claim of ineffective assistance of counsel involves a mixed question of law and fact. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). We review findings of fact, if any, for clear error. *Id.* "We review de novo the constitutional question whether an attorney's ineffective assistance deprived a defendant of his or her Sixth Amendment right to counsel." *People v Fyda*, 288 Mich App 446, 449-450; 793 NW2d 712 (2010). "Where the trial court has not conducted an evidentiary hearing, this Court's review is limited to mistakes apparent on the record." *People v Hughes*, 339 Mich App 99, 105; 981 NW2d 182 (2021) (quotation marks and citation omitted). Issues of statutory interpretation are reviewed de novo. *People v Ambrose*, 317 Mich App 556, 560; 895 NW2d 198 (2016).

"Both the Michigan and United States Constitutions guarantee criminal defendants the right to be represented by counsel." *Otto*, ___ Mich App at ___; slip op at 4, citing Const 1963, art 1, § 20; US Const, Am VI. "The constitutional right to counsel is not merely the right to have a lawyer stand or sit nearby; rather, a criminal defendant has the right to the effective assistance of counsel." *Otto*, ___ Mich App at ___; slip op at 4.

An ineffective-assistance-of-counsel claim has two parts: (1) deficiency and (2) prejudice. *Fyda*, 288 Mich App at 450. See also *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "To establish a claim of ineffective assistance of counsel a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense." *Fyda*, 288 Mich App at 450. Regarding the first prong, deficiency, "[t]rial counsel's performance is deficient when it falls below an objective standard of professional reasonableness." *Hughes*, 339 Mich App at 105. "When reviewing defense counsel's

performance, the reviewing court must first objectively determine whether, in light of all the circumstances, the identified acts or omissions were outside of the wide range of professionally competent assistance." *Id.* at 105-106 (quotation marks and citation omitted). The second prong, prejudice, requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022) (quotation marks and citation omitted). "Reasonable probability means a probability sufficient to undermine confidence in the outcome." *Id.* at 637 (quotation marks and citation omitted).

We hold that both McIntosh's claims of ineffective assistance of counsel lack merit.

## B. ADMISSION OF SANE REPORT

McIntosh's ineffective-assistance-of-counsel claim related to the stipulated admission of the SANE report fails because he has not established prejudice. See *Otto*, ___ Mich App at ___; slip op at 4 (explaining that a defendant must establish prejudice to prevail on a claim of ineffective assistance of counsel). McIntosh argues that defense counsel was ineffective for stipulating to the admission of the SANE report as a business record because Solis's testimony amounted to testimonial hearsay that violated McIntosh's rights under the Confrontation Clauses of the United States and Michigan Constitutions. See US Const, Am VI; Const 1963, art 1, § 20. As stated, Solis did not perform the SANE exam. Rather, she testified about two other individuals' statements: (1) Paiz, who performed the SANE examination, and from whose report Solis read, and (2) the victim, whose statements during the SANE examination were memorialized in Paiz's report. This issue, therefore, potentially implicates the Confrontation Clause, double hearsay, and hearsay exceptions related to SANE exams.

At the outset, Solis's testimony regarding Paiz's statements (i.e., the SANE report) violated the Confrontation Clause. The Confrontation Clause prohibits the admission of testimonial hearsay absent a showing that the declarant was unavailable and unless the defendant had a prior opportunity to cross-examine the declarant. *Crawford v Washington*, 541 US 36, 68; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Testimonial hearsay includes pretrial statements "if the declarant would reasonably expect that the statement will be used in a prosecutorial manner and if the statement is made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]' " *People v Lonsby*, 268 Mich App 375, 377; 707 NW2d 610 (2005) (alteration in original), quoting *Crawford*, 541 US at 51-52.

Paiz's statement (i.e., the report), as opposed to the victim's statements contained within the report, was testimonial. See *Lonsby*, 268 Mich App at 377. See also *People v Garland*, 286 Mich App 1, 11; 777 NW2d 731 (2009) (holding that victim's statements to a nurse examiner during a SANE examination were nontestimonial because they were made to meet an ongoing emergency).[1] Paiz's report regarding the SANE examination served a dual function: part

_____

[1] By contrast, the victim's statement did not violate the Confrontation Clause for two reasons. First, McIntosh had the opportunity to cross-examine the declarant—the victim; therefore, this did

therapeutic or medical and part investigative. Dr. Czolgosz, the emergency room physician, acknowledged that part of the examiner's role is to collect evidence. And the prosecution predictably relied on the document to present Paiz's work to the jury by having Solis read it when Paiz was unavailable.

Assuming, without deciding, that this Confrontation Clause violation was a deficiency on the part of trial counsel,[2] McIntosh cannot illustrate prejudice for three reasons. First, the objection would not necessarily have kept out the content of Paiz's report. The most likely outcome of such an objection is that the trial (or Paiz's testimony) would be rescheduled to a date when Paiz was available for in-person testimony and cross-examination. Second, it is not clear that Paiz testifying about her own observations and interaction with the victim would benefit McIntosh. He points to no credibility issues or other differences between Paiz and Solis that would lead to a different outcome. Third, although Paiz's description of the victim's statements provided a clearer description of the penetrative nature of the sex act at issue in this case than the victim's other prior statements, if Paiz had been available to testify, her recollection of the victim's statements would still have been admissible. See *Garland*, 286 Mich App at 9-11.

This third issue overlaps with McIntosh's argument that the SANE report was not admissible under MRE 803(4) because the victim did not go to the SANE for diagnosis and treatment and her statements to the SANE were not made for the purpose of diagnosis and treatment. We disagree.

Hearsay is a statement, other than the one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. See MRE 801(c). Hearsay is inadmissible, unless an exception applies. See MRE 802. MRE 803(4) provides an exception to the hearsay rule, even though the declarant is available as a witness:

> Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment. [*People v Gursky*, 486 Mich 596, 624 n 53; 786 NW2d 579 (2010), citing MRE 803(4).]

---

not violate defendant's right to confront and cross-examine a witness against him. Second, the record is sufficiently developed for us to conclude that the victim made the statement to obtain medical treatment during an ongoing medical emergency, meaning it was not testimonial. See *Garland*, 286 Mich App at 11. See also *People v Spangler*, 285 Mich App 136; 774 NW2d 702 (2009) (remanding to develop the record to determine whether the child victim's statement to sexual assault nurse examiner were nontestimonial).

[2] We acknowledge the possibility that the decision not to object on the basis of a Confrontation Clause violation may have been strategic or practical. An objection may merely have resulted in rescheduling her testimony or the trial to a date when Paiz was available, as opposed to excluding the substance of Paiz's report and testimony altogether.

"Exceptions to the hearsay rule are justified by the belief that the hearsay statements are both necessary and inherently trustworthy." *People v Meeboer*, 439 Mich 310, 322; 484 NW2d 621 (1992). In *Meeboer*, our Supreme Court held that the identification of an assailant in a sexual assault examination met the requirements for admission under this exception. *Id*. at 331.

> In order to be admitted under MRE 803(4), a statement must be made for purposes of medical treatment or diagnosis in connection with treatment, and must describe medical history, past or present symptoms, pain or sensations, or the inception or general character of the cause or external source of the injury. Traditionally, further supporting rationale for MRE 803(4) are the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient. The trustworthiness of a child's statement can be sufficiently established to support the application of the medical treatment exception. Furthermore, we find that the identification of the assailant is necessary to adequate medical diagnosis and treatment. [*Id*. at 322.]

Here, the victim's SANE examination occurred hours after the sexual assault. She went to the SANE examination immediately after her discharge from the hospital. This followed her doctor's referral for continuation of care that otherwise would have happened at the hospital. Her statements, therefore, were admissible under MRE 803(4) because our evidentiary rules provide that a statement made for medical treatment is reliable. See *id.* at 328. In other words, the victim's statements during the SANE examination would have come in.[3] McIntosh has not demonstrated how they otherwise would have been excluded.

Finally, McIntosh's arguments regarding the SANE report fail for a more fundamental reason: he underestimates the value of the victim's testimony and corroborating evidence at trial. We acknowledge that victim's statements in the SANE report present a clearer description of the penetrative nature of the sex acts. But even without the SANE report, the victim's testimony and corroborating evidence provide high confidence in the result. Even if McIntosh established deficiency—that his lawyer's conduct failed to keep the SANE report out of evidence—the evidence of his guilt is sufficiently strong that removing the SANE report from the body of evidence would not yield a different result.

---

[3] The trial court cited *Meeboer* when ruling that only those statements that the victim made for the purpose of medical diagnosis and treatment would be admitted at trial. McIntosh now takes the position that this ruling was erroneous, but only to the extent that defense counsel failed to object to the admission of the SANE report. Because the trial court specifically ruled on the issue, it would have been both unnecessary and futile for defense counsel to raise any further objection on this basis. "Failure to raise a futile objection or advance a meritless argument does not constitute ineffective assistance of counsel." *People v Isrow*, 339 Mich App 522, 532; 984 NW2d 528 (2021).

C.  IMPEACHMENT OF DEFENSE WITNESS BY ADMISSION OF PRIOR CRIMES

McIntosh also argues that he is entitled to a new trial because defense counsel provided ineffective assistance of counsel when he failed to object to impeachment evidence of prior crimes committed by defense witness, Lorontay McIntosh.  This argument fails because McIntosh cannot demonstrate that his trial counsel's performance prejudiced him.

As stated, when Lorontay testified, he was wearing MDOC-issued clothing.  Defense counsel addressed that issue with Lorontay as follows:

> *Q.* Now you dressed in jail uniform, correct?
>
> *A.* Yes, sir.
>
> *Q.* You've been a bad boy, haven't you?
>
> *A.* Yes, I have.
>
> *Q.* And you're paying the price for that?
>
> *A.* Yes, I am.

Thereafter, the prosecutor asked where Lorontay lived, and he replied that he was living at the Macomb Correctional Facility.  When asked why he was there, Lorontay answered, "For armed robbery."  Plaintiff then asked Lorontay about other felonies he committed, and Lorontay confirmed his prior convictions of receiving and concealing stolen property and breaking into a building with intent to commit a larceny.

Impeachment by evidence of a criminal conviction is permitted pursuant to MRE 609, which provides:

> (a) For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall not be admitted unless the evidence has been elicited from the witness or established by public record during cross-examination, and
>
> > (1) the crime contained an element of dishonesty or false statement, or
> >
> > (2) the crime contained an element of theft, and
> >
> > (A) the crime was punishable by imprisonment in excess of one year or death under the law under which the witness was convicted, and
> >
> > (B) the court determines that the evidence has significant probative value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court further determines that the probative value of the evidence outweighs its prejudicial effect.

(b) For purposes of the probative value determination required by subrule (a)(2)(B), the court shall consider only the age of the conviction and the degree to which a conviction of the crime is indicative of veracity. If a determination of prejudicial effect is required, the court shall consider only the conviction's similarity to the charged offense and the possible effects on the decisional process if admitting the evidence causes the defendant to elect not to testify. The court must articulate, on the record, the analysis of each factor.

As discussed, McIntosh raises this issue not to claim that the trial court erred when it admitted the impeachment evidence, but only to argue that defense counsel was ineffective for failing to object when plaintiff cross-examined Lorontay about his criminal history.

McIntosh appears to take the position that the impeachment evidence offered by plaintiff was inadmissible as a matter of law. But that is not the required inquiry. The trial court is supposed to conduct an inquiry to determine whether, and to what extent, the prior conviction is probative of the witness's character for truthfulness. *People v Snyder*, 301 Mich App 99, 108; 835 NW2d 608 (2013). This includes an inquiry into the crime itself, as well as the surrounding circumstances, to determine whether they were indicative of veracity. *Id*. at 108-109.

Although McIntosh complains of the trial court's failure to make this determination because of defense counsel's failure to raise the issue, he fails to offer any facts or description of Lorontay's crimes to show that, had defense counsel raised the issue, Lorontay's convictions would have been inadmissible as impeachment evidence under MRE 609. Instead, McIntosh merely asserts that, in general, receiving and concealing stolen property may or may not involve an element of dishonesty, and that armed robbery and entering a building with intent to commit a larceny involve elements of theft. Our courts have ruled that theft crimes may be minimally or moderately probative on the issue of veracity. In *People v Meshell*, 265 Mich App 616, 635; 696 NW2d 754 (2005), this Court ruled that "[t]heft crimes are minimally probative on the issue of credibility," though our Supreme Court in *People v Allen*, 429 Mich 558, 610-611; 420 NW2d 499 (1988), ruled that theft crimes are "moderately probative of veracity." However, MRE 609 contemplates that *some* crimes involving an element of theft are appropriate for impeachment purposes. See MRE 609(a)(2) (providing for impeachment by evidence of crimes involving an element of theft).

It is difficult to determine from McIntosh's arguments on appeal whether Lorontay's prior convictions were or were not indicative of Lorontay's truthfulness because McIntosh does not describe any of the circumstances surrounding any of Lorontay's crimes in order for us to determine whether such a challenge would have been successful. Notably, McIntosh did not move for an evidentiary hearing either in the trial court or in this Court to establish a factual predicate for his claim. His failure to do so, along with a lack of any factual assertion to support his claim on appeal, prevents our review of whether Lorontay's convictions were inadmissible as not adequately probative of his veracity. It is not enough for an appellant to assert an error and then leave it for us "to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments . . . ." *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006), aff'd 482 Mich 851 (2008) (quotation marks and citation omitted). Because McIntosh has made no showing

that the evidence of Lorontay's convictions would actually have been inadmissible as impeachment evidence, he cannot show that Lorontay's testimony would have been any different.

Even if we were to assume that counsel was deficient for failing to object to the impeachment evidence, McIntosh fails to establish that there is a reasonable probability that the outcome of his trial would have been different but for this purported deficiency. First, its not clear that all of Lorontay's prior convictions would have been excluded if defense counsel challenged their admission. Further, if one or two of Lorontay's prior convictions were used to impeach him, but not the others, it is not at all clear that the jury would have found more persuasive Lorontay's limited assertion that the victim told him that she lied about McIntosh's conduct. Admittedly, if believed, Lorontay's testimony would undercut the victim's testimony. But excluding his prior convictions would not necessarily make his testimony believable. The victim testified clearly about McIntosh's penetrative sex acts. The narrative of her testimony aligned with that of other witnesses, like her mother, the emergency room doctor, and even McIntosh who admitted destroying the note she gave him. It also aligned with other circumstantial evidence, such as her flight from the apartment and McIntosh's dubious explanation for why she left. McIntosh fails to explain how excluding Lorontay's prior convictions would make him so believable as to overcome the other direct and circumstantial evidence in the case pointing toward his guilt. In sum, McIntosh cannot demonstrate that the purported deficiency affected the outcome of the trial.

### III. GUIDELINES SCORING

McIntosh also argues that, at sentencing, the trial court improperly assessed OV 3 (related to physical injury) and OV 19 (interference with administration of justice). We disagree.

We review for clear error a trial court's findings of fact for purposes of scoring the sentencing guidelines. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). The trial court's factual determinations must be supported by a preponderance of the evidence. *Id*. We also review de novo whether the facts support the statutory scoring conditions. *Id*.

OV 3 related to physical injury to the victim. See MCL 777.33(1). The trial court must assess five points for OV 3 if "[b]odily injury not requiring medical treatment occurred to a victim." MCL 777.33(1)(e). "This Court has defined 'bodily injury' as including 'anything that the victim would, under the circumstances, perceive as some unwanted physically damaging consequence.' " *People v Johnson*, 342 Mich App 90, 95; 992 NW2d 668 (2022), quoting *People v McDonald*, 293 Mich App 292, 298; 811 NW2d 507 (2011).

Evidence at trial showed that, during the assault, the victim felt a sharp pain when McIntosh tried to force his penis into her vagina. Although he was unable to fully penetrate the victim's vagina, after the assault, the victim experienced vaginal pain that felt as though something was poking her in her vaginal area. Evidence also showed that the victim's vagina was tender to the touch after the incident. Vaginal pain caused by McIntosh's penis that occurred when he sexually assaulted his 15-year-old daughter was an injury that the victim would perceive as an "unwanted physically damaging consequence." *Johnson*, 342 Mich App at 95. Although the injury was not permanent and did not require medical intervention (beyond the initial emergency room visit and SANE exam), permanent harm and medical intervention are not required to assess OV 3 at five

points. That the victim suffered vaginal pain and tenderness as a consequence of McIntosh's criminal sexual conduct was sufficient to merit this score.

McIntosh also argues that the trial court should not have assessed OV 19 at 10 points. We disagree. MCL 777.49(c) provides that the trial court should assess 10 points for OV 19 if the defendant "interfered with or attempted to interfere with the administration of justice . . . ." "[T]he plain and ordinary meaning of 'interfere with the administration of justice' for purposes of OV 19 is to oppose so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process." *People v Hershey (On Remand)*, 303 Mich App 330, 343; 844 NW2d 127 (2013). Our Supreme Court has held that, as one example, 10 points may be assessed for OV 19 if a defendant gives a false name to the police. *People v Barbee*, 470 Mich 283, 285; 681 NW2d 348 (2004). The score was appropriate in *Barbee* because the defendant interfered with a police investigation which "is critical to the administration of justice." *Id*. at 288.

The trial court assessed OV 19 at 10 points because McIntosh purposely destroyed the letter that the victim wrote to him in which she set forth various allegations of his ongoing sexual abuse. The record reflects that the victim gave McIntosh a note with a copy of a Bible she found at home to try to let McIntosh know that she wanted him to stop assaulting her so that she could have a normal father-daughter relationship with him. In the note, the victim referred to McIntosh's sexual abuse and said that she would be willing to forgive him if he stopped assaulting her.

A Grand Rapids Police Department detective testified that, on August 22, 2019, McIntosh made a phone call to his wife from jail and told her that he threw away the letter. At trial, McIntosh admitted that he tore up the victim's letter, but he denied that the victim ever had a Bible with her or that she accused him of misconduct. Conflicting with his testimony, officers found a Bible matching the description the victim provided hidden under the seat of the vehicle that McIntosh was driving on the day the sexual assault occurred. McIntosh's act of destroying an incriminating letter detailing a history of sexual abuse justifies a score of 10 points because it establishes that his conduct was intended to destroy evidence so that his crimes would not be discovered. This amounted to an act that interfered with a police investigation, and therefore, the trial court properly assessed OV 19.

We affirm.

/s/ Kathleen A. Feeney
/s/ Michelle M. Rick
/s/ Noah P. Hood